UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA :
  Plaintiff :
 :
v. : CRIMINAL NO: 04-30046-10 MAP
 :
JOSEPH SULLIVAN :
  Defendant :

**DEFENDANT'S SENTENCING MEMORANDUM
AND
MOTION FOR DOWNWARD DEPARTURE**

Joseph Sullivan appeared before Your Honor on May 8, 2006, and pleaded guilty to two counts of Wire Fraud in violation of Title 18 U.S.C. §1343 (Cts 23 , 57s) and one count of Conspiracy to Launder Money in violation of Title 18 U.S.C. § 1956 and 1957 (Ct 69s). While there is a plea agreement in this case, there is no agreement on guideline calculations or factors that may warrant a departure.

### Guideline Calculations

In January 2005, the Supreme Court decided that when imposing sentence the Court must consider the Sentencing Guidelines and Policy Statements *United States v Booker,* 125 S.Ct. 738 (2005). Thus, the guidelines have been rendered as advisory. In considering the advisory guidelines, the court is encouraged also to consider policy statements and rules that permit departures under the guidelines for appropriate reasons.

Using the Court's method of finding loss, Sullivan's loss number is just over $1 million which results in a 16-level increase in the fraud loss table ($1 million - $2.5 million). The defendant has objected to being held accountable for more than 10 victims,

1

and maintains that he should be held accountable only for the 8 lending institution victims named in his objections to the PSR.[1]

The defendant continues to object to the enhancement for abuse of trust in the offense of the money laundering. Keeping in mind the court's conclusion regarding this enhancement in a co-defendant's case, the defendant wishes to augment his objection to this enhancement. First, the defendant avers that he did not hold a position of trust at the time he committed the wire fraud offenses. For the most part, Sullivan functioned as a trainee appraiser. He did not have professional or managerial discretion for his appraisal work. His work was supervised. During most of the entire period of his part in the conspiracy, Sullivan functioned as a trainee. Early in 2001, Sullivan began working at Commonwealth Appraisal Company. Still a trainee, he began to have a fuller understanding of his responsibilities as an appraiser. He had begun taking classes to get certified as an appraiser. As he learned more, he did more to extricate himself from inflating home values. Although he always felt uneasy about inflating home values, he did not have an appreciation for or knowledge of the rules set up for appraisers to avoid the very conflicts of interest that he was engaging in. His supervisors signed off on his appraisals. While Sullivan admits he continued to inflate appraisals while working at Commonwealth, he tried to become more discerning. Of the thirty-eight fraudulent loans where Sullivan performed the appraisals, only seven of them were in 2001. Sullivan did not become a licensed Appraiser until August 2001. Two counts (of the seven) occurred

---

[1] With all due respect to buyer victims, some of whom indeed were victimized, a victim letter from the owner of 108 Ranney Street, states that the buyer has to sell the property. This statement made in the context of claiming victimization by the defendants fails to disclose the fact that on November 18, 2002, the buyer qualified for refinancing in the amount of $107,100. One must assume she was qualified as a borrower by Centex Home Equity company, LLC. The Equicredit loan was thereafter discharged presumably through this refinancing. It is presumed that Centex Home Equity also charges high interest rates. 108 Ranney St. is tax assessed at $110,800. (Real Estate Documents attached)

2

after August 2001, Cts, 62 and 65. The lending companies made money on both of those properties after foreclosure (see attached chart).

Second, the defendant understands that the Abuse of Trust enhancement for the monetary transactions takes into account relevant conduct. Thus the defendant's conduct in the monetary transactions is within the context of the common scheme or plan as the defendant's conduct in the Fraud scheme, i.e., payments for appraisals charged as monetary transactions come from the fraud scheme. *See U.S. v Camuti,* 78 F.3d 738, 745-46(1st Cir. 1996).

The defendant is convicted of Ct 69s , Conspiracy to Launder Money, the object of the conspiracy was to "facilitate the wire fraud scheme by paying the costs of the various third parties, such as any outstanding mortgages, involved in the real estate transactions and distributing the net profits of the wire fraud scheme to the defendants and co-conspirators for outstanding obligations and investment in future real estate transactions." Sullivan was in the category being paid for "outstanding obligations."

As with other conspiracies, the money laundering conspiracy is not necessarily the same for every defendant. The conduct of the defendant in the jointly undertaken activity must be both "(i) in furtherance of the jointly undertaken activity; and (ii) reasonably foreseeable in connection with that activity." §1B1.3(a)(1)(n.2) The Application Note adds that "the scope of the criminal activity jointly undertaken by the defendant…is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." Thus, for Sullivan to be held accountable for the entire money laundering conspiracy, he would have had to reasonably foresee that his appraisal fees which were for outstanding obligations only

3

were somehow going to be invested in future real estate transactions. This scenario is impossible since Sullivan was not an investor in the scheme. Sullivan is guilty of Ct 69s because the object of his part of the conspiracy was that he received appraisal fees from illicit funds. Sullivan did not abuse any trust by accepting appraisal payments.

Put another way, if Sullivan abused his position of trust in the fraud scheme, which he did not, then that enhancement cannot and should not automatically carry over to the monetary transaction count without something more. *See U.S. v Young* 266 F.3d 468 (6th Cir. 9/20/2001) (Young was city manager for a city Michigan with significant supervisory control and responsibility over the City's budget. Young was convicted of Embezzlement and Engaging in Monetary Transactions, a violation of 18 U.S.C. §1957. In holding Young accountable for Abusing a Position of Trust for the Monetary Transactions, the court found "Defendant's underlying embezzlement activity significantly facilitated the withdrawal of funds that formed the basis of his money laundering conviction. In preparing to commit the money laundering offense of withdrawing the municipal funds from his fraudulent business accounts, Defendant embezzled the funds from the City of Newaygo into those business accounts. Therefore, Defendant's embezzlement conduct was necessarily conduct relevant to the money laundering offense.") The Young court found a nexus between the defendant's actions as an embezzler and his actions in the money laundering offense because Young had set up fraudulent business accounts to deal with the money he embezzled. Unlike Young, Sullivan's role in inflating appraisals do not create a nexus with his role in receipt of the fraudulent funds as a fee for his services. While it is true that his inflated appraisals aided and abetted the fraud scheme, his role in that scheme did not carry over to his role in

4

being paid for his services. Nor is there any evidence that Sullivan knew his co-conspirators were re-investing fraudulent funds into the scheme. Sullivan took his fees and paid his rent. Without something more than the defendant's liability for both offenses, there is no basis for enhancing his offense for Abuse of Trust.

**Factors to Warrant a Departure from the Guideline**

The defendant reiterates his and probation's position that his criminal history category is more akin to a person with 2 criminal history points, a CHC II. *See* PSR ¶325 and defendant's objections to ¶325.

Next, the defendant submits that the offense level at §2B1.1 overstates the seriousness of the defendant's overall offense. Where enhancements are sufficiently distinct to escape the vice of double counting, but nonetheless substantially overlap (such as number of properties and number of victims, role), the overlap can over-punish defendants in a manner and degree not contemplated by the Sentencing Commission. *See* U.S. v Jackson, 346 F.3d 22 (2d Cir. 2003); U.S. v Lauerson, 348 F.3d 329 (2d Cir. 2003), *adhered to on rehearing,* 362 F.3d 160 (2d Cir. 2004). *See also* U.S. v Kostakis, 364 F.3d 45 (2d Cir. 2004). The defendant believes that although he was involved in about a third of the properties, he is among the least culpable of the conspirators. As a paid appraiser trainee, he did not have full knowledge of the scope of the conspiracy. He knew his appraisals were inflated, but he had no idea there were second phantom mortgages, or that buyers were submitting fraudulent documents. Further, although the court has found its own methodology for assessing loss, the fact remains that the ultimate loss to lending institutions in the counts to which Sullivan is being held accountable

amounts to $189,056. When considering the loss/gain ratio, the loss is reduced to $52,491. (Loss table attached)

There are other factors regarding loss that the defendant wishes the court to consider. Of the total 38 loans in which Sullivan was the appraiser, nine of them were purchased by the investors and were not "flipped" shortly after they were purchased. The most glaring example is Ct 45 in regard to 62 Sycamore Street. That property was purchased on 7/14/1988, fully 12 years before it was sold on 11/22/2000. This property cannot be held in the same category as the others that were "flipped."

Ct 29  34 Cambridge Street   Purchased five months before the "flip."

Ct 31  51 Winthrop Street   Purchased a year before the "flip."

Ct 42  49 Montrose Street   Purchased 2 years before the "flip."

Ct 49  50 Church Street   Purchased a year and a half before the "flip."

Ct 51  154 Oak Street   Purchased 14 months before the "flip."

Ct 54  93 Dawes Street   Purchased 5 months before the "flip."

Ct 62  272-274 Orange Street   Purchased 7 months before the "flip."

Ct 65  130-132 Orange Street   Purchased 5 months before the "flip."

These nine properties represent a quarter of the properties Mr. Sullivan appraised. None of the nine properties lost any money for the lender. (See chart attached) It is difficult to characterize these properties under the "flip" category. To be sure, documents were fraudulent in securing the loan and Sullivan performed the appraisal, but the properties were not turned over rapidly in the same manner as others named in the indictment. The defendant should not be held accountable for the loss in these properties, especially since they do not fit the pattern of the fraud conspiracy and there was no loss.

Inasmuch as the actual loss for all the properties in which Sullivan did the appraisals amounts to $189,056, and that fully one quarter of the counts the defendant is named in do not fit the profile of the scheme, the defendant wishes the court to give some consideration to the fact that the loss found by the Court's methodology overstates the seriousness of Sullivan's offense.

Finally, USSG §5H1.11 states that Military service is not ordinarily relevant in determining whether a departure is warranted. The defendant wishes the court to consider Joe's military service as something more than what it appears on the surface. The defendant volunteered to go to Bosnia, partly to assist the forces there, but also as a means to do penance for his misdeeds in the offense. The defendant is so distraught over his misdeeds that he wished to make amends in service to his country, return to U.S. and start afresh.

The defendant submits that the Court could make a structured departure as follows:

| | |
|---|---|
| Base Offense Level | 6 |
| Loss more than $120,000 less than $200,000 | +10 |
| Acceptance of Responsibility | -3 |
| Total Offense Level | 13 |

Level 13, CHC II   = 15 – 21 months.

**Considerations of 18 U.S.C. §3553(a)**

Joe Sullivan emanates from a close- knit middle class Springfield family. He is a 29-year old graduate of Cathedral High School and attended Springfield Tech on and off for several years before deciding that he preferred the work world. While still in High School, Sullivan enlisted in the U.S. Army National Guard and served in Bosnia for

7

about nine months from mid-2001 to mid-2002. When he returned from Bosnia, his life changed dramatically for the better when he met his fiancée, Amanda Hendrix. Although the relationship did not begin as an exclusive one, when the couple decided to devote themselves only to each other, Ms. Hendrix was pregnant with another man's child. The defendant was unfazed by this news. He loves Ms. Hendrix and stuck by her during the pregnancy and birth of Connor. Connor's biological father agreed to give up paternity rights to Connor and agreed to allow Sullivan to adopt Connor as his own. The defendant has loved and cared for Connor since the boy's birth. The defendant is the only father that Connor has ever known. Plans were for the defendant to adopt Connor and marry Amanda prior to his indictment in this case. Plans were put on hold until there is some sense of how long it will be before the family can get on an even footing. Amanda is presently pregnant with the defendant's child, due in March 2007. The defendant's main concerns are for the health and happiness of his family. He worries that Amanda will be alone when she gives birth to their child in March.

Ironically, since August 2001 when he became a licensed real estate appraiser, Sullivan had been working as the owner/operator of Sullivan Appraisals, conducting a legitimate and careful business. His license was revoked in December 2004 as a result of his involvement in the instant offense. Sullivan can no longer work as an appraiser. All that he has learned about the business is lost to him.

The court is well aware of the need for the sentence imposed to be no greater than necessary to meet the purposes of the statute.

Sullivan cannot be said to be a danger to the public. He has learned a hard lesson about participating in any fraud. He did not create the fraud, but found himself a willing participant. He understands there will be punishment for his participation.

All things considered, a sentence that provides some punishment but does not cripple his ability to return to the community and resume caring for his family is all the defendant can ask for.

Respectfully Submitted<br>
The Defendant, Joseph Sullivan<br>
By His Attorney<br>
<br>
Thomas A. Kokonowski, Esq.<br>
101 State St. Suite 715<br>
Springfield, MA 01103<br>
413-737-9700<br>
BBO#564549